## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL J. MANDELBROT and THE MANDELBROT LAW FIRM, <br><br> Plaintiffs, <br><br> v. <br><br> ARMSTRONG WORLD INDUSTRIES ASBESTOS PERSONAL INJURY SETTLEMENT TRUST, BABCOCK & WILCOX ASBESTOS PERSONAL INJURY SETTLEMENT TRUST, OWENS CORNING/FIBREBOARD ASBESTOS PERSONAL INJURY TRUST, FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST, UNITED STATES GYPSUM ASBESTOS PERSONAL INJURY SETTLEMENT TRUST AND CELOTEX ASBESTOS SETTLEMENT TRUST <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 13-cv-01032 – GMS <br><br> **Related Docket No. 9** |

## OPENING BRIEF IN SUPPORT OF MOTION OF MICHAEL J. MANDELBROT AND THE MANDELBROT LAW FIRM FOR A PRELIMINARY INJUNCTION

Date:   June 21, 2013
        Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
Seth S. Brostoff (No. 5312)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

*Attorneys for Plaintiffs Michael Mandelbrot and The Mandelbrot Law Firm*

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ........................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 3

A.   The Delaware Trusts ............................................................................................ 3

B.   Plaintiffs' Claims and the Delaware Trusts' Actions ........................................... 5

C.   Impact of the Delaware Trusts Actions ............................................................. 11

ARGUMENT ................................................................................................................. 13

I.    Standards for Granting Preliminary Injunctive Relief ....................................... 13

II.   The Court Should Grant Preliminary Injunctive Relief In Favor of the Plaintiffs ........... 14

A.   Likelihood of Success of Merits ........................................................................ 14

B.   Irreparable Harm ............................................................................................... 16

C.   Balancing of Harms ........................................................................................... 18

D.   Public Interest .................................................................................................... 19

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

Crouch v. Prior, 905 F. Supp. 248 (D.V.I. 1995) ........................................................... 14

Doran v. Salem Inn, Inc., 95 S. Ct. 2561 (1975) ........................................................... 18

GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp., 197 Fed. Appx. 120 (3d Cir. 2006).......................................................................................................................... 14

Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160 (3d Cir. 2001) ..................... 14

In re Diet Drugs Prod. Liability, 236 F. Supp.2d 445 (E.D. Pa. 2002) ............................ 16, 17, 19

In re Olympia Holding Corp., 141 B.R. 443 (Bankr. M.D. Fla. 1992) ........................... 18

Instant Air Freight Co. v. Air Freight, Inc., 882 F.2d 797 ............................................. 16

Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir. 1982)................................................. 13

Keurig, Inc. v. Strum Foods, Inc., 769 F.Supp.2d 699 (D. Del. 2011) .......................... 13

Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004) .................................... 13

Newlife Homecare Inc. v. Express Scripts, Inc., 2007 WL 1314861 (M.D. Pa. 2007) ............... 18

## STATUTES

### Federal

Fed. R. Civ. P. 65. ......................................................................................................... 13

## NATURE AND STAGE OF PROCEEDINGS

On June 7, 2013, plaintiffs Michael J. Mandelbrot and the Mandelbrot Law Firm ("MLF" and, together with Mr. Mandelbrot, the "Plaintiffs") filed their verified complaint seeking declaratory and injunctive relief (the "Complaint") against defendants the AWI Trust,[1] the B&W Trust, the Owens Trust, the Federal-Mogul Trust, the USG Trust and the Celotex Trust (collectively with the AWI Trust, B&W Trust, the Owens Trust, the Federal-Mogul Trust and the USG Trust, the "Delaware Trusts" or the "Defendants"). Each of the Delaware Trusts is an asbestos personal injury trust formed in connection with the confirmation of a plan of reorganization in a chapter 11 bankruptcy proceeding. The beneficiaries of the Delaware Trusts are generally individuals with asbestos-related diseases caused by prolonged exposure to products manufactured by the debtors in the various bankruptcy proceedings. The Plaintiffs represent beneficiaries of the Delaware Trusts and file claims on their behalf with the Delaware Trusts.

On October 4, 2012, the Delaware Trusts suspended all offers to pay claims submitted by the Plaintiffs and ceased accepting new claims from the Plaintiffs, pending a further review of claims. Thereafter, on November 20, 2012, the Delaware Trusts informed the Plaintiffs that they would not accept or process further claims from the Plaintiffs unless Plaintiffs agreed in advance to pay the costs of an expanded audit. These actions violated the terms of the Delaware Trusts' governing documents.

Simultaneously with this brief, the Plaintiffs have filed their motion for preliminary injunctive relief (the "Motion') which seeks (i) to enjoin the Defendants (a) from refusing to

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in *Affidavit of Michael J. Mandelbrot in Support of Motion of Michael J. Mandelbrot and the Mandelbrot Law Firm for a Preliminary Injunction* (the "Mandelbrot Affidavit, which was filed contemporaneously with this Brief).

accept and/or process claims submitted by the Plaintiffs while they conduct a full audit of claims submitted to the Defendants by the Plaintiffs and (b) from requiring the Plaintiffs to agree in advance to pay substantial costs the Defendants allege will be incurred in conducting such audit and (ii) to require the Defendants to accept and process claims submitted by the Plaintiffs to the Defendants.  This is Plaintiffs' Opening Brief in support of their Motion.

## SUMMARY OF ARGUMENT

1.  The Plaintiffs are likely to succeed on the merits in this matter because the actions taken by the Delaware Trusts on October 4, 2012 and November 20, 2012 were not authorized by the documents governing the Delaware Trusts.  These documents authorize certain of the punitive actions such as those taken by the Delaware Trusts **only** if an audit first reveals that such claimant or attorney submitted **fraudulent information** in support of a claim.  However, the Delaware Trusts did not discover any fraudulent information submitted by the Plaintiffs. Rather, the Plaintiffs themselves (i) discovered the only evidence, prepared by a former employee, that could even be considered to be fraudulent, (ii) voluntarily and promptly provided the Delaware Trusts with a detailed report of that information and (iii) promptly withdrew all claims submitted by that former employee.  Moreover, while the Trusts' governing documents permit it to seek sanctions against a law firm from the Bankruptcy or District Court, they do not permit the Trusts to unilaterally stop accepting and processing claims if that firm does not accept and waive further review of its proposed sanctions.

2.  The Plaintiffs can establish that they and their clients will suffer irreparable harm if the preliminary injunction is not granted for three independent reasons.

- First, all claimants represented by the Plaintiffs face imminent irreparable harm due to the Delaware Trusts' refusal to process their claims.  The removal of these claims from the FIFO claims processing queue will undoubtedly cause a substantial delay in the resolution and payment of these claims and may well result in a reduction of the actual

amount that they will receive on account of their claims.  Moreover, these claimants face the risk that necessary evidence supporting the claims may disappear as time passes.

- Second, the claimants who have been prevented from filing their claims face imminent irreparable harm because further delays may cause them to miss their deadlines for filing claims.

- Third, the Plaintiffs face imminent and irreparable harm because the ongoing suspension of claims processing and the Delaware Trusts' demand that the Plaintiffs consent in advance to pay for the proposed audit, which could cost up to $150,000, if not remedied promptly, will likely force MLF to close.

3.      In contrast to the imminent and irreparable harm the Plaintiffs face, the entry of a preliminary injunction will cause little harm to the Delaware Trusts because they have (i) the ability to review each and every claim submitted by the Plaintiffs prior to any payment on the claims, (ii) authority to audit as many claims as necessary to ensure that unreliable claims are not paid, and (iii) the ability to seek sanctions from a Court against an entity determined to be submitting fraudulent information.

4.      The Delaware Trusts' unauthorized actions are contrary to the public interest because they are thwarting the purpose of the Delaware Trusts for the beneficiaries of the Delaware Trusts represented by the Plaintiffs.  These claimants are not being treated fairly, equitably, or substantially similar to other claimants.  The Delaware Trusts have the ability to remedy this inequality by continuing to accept, process and pay reliable claims submitted by the Plaintiffs while conducting an audit and, through the review process, ensuring that unreliable claims are not paid.

## STATEMENT OF FACTS

### A.      The Delaware Trusts

Each of the Delaware Trusts was formed as a vehicle for the payment of claims for personal injury resulting from exposure to asbestos contained in products manufactured by companies that had sought protection from creditors under chapter 11 of the United States

Bankruptcy Code. 11 U.S.C. §§ 101 *et seq.* Mandelbrot Affidavit at ¶2. The formation of the Delaware Trusts permitted the debtors to confirm plans of reorganization that allowed them to escape the burdens of their ongoing asbestos liabilities, emerge from bankruptcy and continue their business operations while providing some payments, through the Delaware Trusts, to victims of asbestos-related diseases caused by their products.

The beneficiaries of the Delaware Trusts are primarily individuals with asbestos-related diseases, estate representatives of deceased individuals who had asbestos-related diseases, and individuals who develop asbestos-related diseases in the future. *Id.* at ¶2. The purpose of the Delaware Trusts, generally, is to provide equitable and substantially similar treatment for all beneficiaries of the Delaware Trusts.[2]

The Delaware Trusts' claims procedures are truncated in recognition of the (i) sheer number of claims, (ii) the limited payments to be made to claimants due to the Delaware Trusts' limited assets and the need to preserve those assets for the payment of future claims and (iii) the difficulty of providing and/or rebutting evidence of asbestos exposures which occurred decades ago. Pursuant to the Distribution Procedures, claimants generally must submit a claim form and supporting documentation to substantiate that the claimant meets the specified criteria establishing disease and damages caused by exposure to asbestos for which the specific companies are legally responsible. *Id.* at ¶3. The documentation may include any credible evidence such as affidavits, deposition transcripts, business records, military service records, and/or deck logs, and the Delaware Trusts may require additional evidence to support the claims submitted. Claimants and/or their attorneys must certify the documentation submitted. *Id.*

---

[2] *See* Mandelbrot Affidavit at ¶2 and Exhibits A through F.

The Distribution Procedures generally authorize the Delaware Trusts to develop methods for auditing the reliability of evidence submitted to the Delaware Trusts by claimants. *See id.* at ¶ 4. Further, the Distribution Procedures provide for the possibility of sanctions or penalties for claimants or claimants' attorneys if an audit reveals that such claimant or attorney submitted **fraudulent information** in support of a claim. *Id.* at ¶4.

Specifically, Section 5.8 of each of the Distribution Procedures other than the Celotex Trust Claims Distribution Procedures provides as follows:

> [I]n the event that an audit reveals that fraudulent information has been provided to the [] Trust, the [] Trust may penalize any claimant or claimant's attorney by disallowing the [] Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' [] Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting fraudulent evidence in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

*Id.* at ¶5. Section 7.4 of the Celotex Trust Claims Distribution Procedures provides as follows:

> [T]he Trustees may seek sanctions from the District Court including, but not limited to, payment of the costs associated with the audit and any future audit or audits, reordering the priority of payment of the affected claimants' Asbestos Personal Injury Claims, raising the level scrutiny of additional information submitted from the same source or sources, or prosecuting the claimant or claimant's attorney for presenting a fraudulent Asbestos Personal Injury Claim in violation of 18 U.S.C. § 152 or applicable state law.

*Id.* at ¶6.

## B.   Plaintiffs' Claims and the Delaware Trusts' Actions

MLF is a sole practitioner law practice with its only office in Novato, California, north of San Francisco, California.  Mr. Mandelbrot is MLF's only lawyer and the firm has a staff of seven individuals.  The Plaintiffs specialize in preparing and filing asbestos-related claims with settlement trusts such as the Delaware Trusts. *Id.* at ¶7.

Typically, MLF's clients/claimants are referred to MLF by trial lawyers around the country who are unfamiliar with the exacting requirements of claims materials to be submitted and the settlement trusts' labyrinthine review processes. MLF is typically paid a portion of the contingency fee earned by the referring counsel. *Id.* at ¶8.

MLF has a large referral network, and other plaintiffs lawyers have come to rely on MLF because of its expertise and vast database of documents relevant to the use of asbestos products in the United States dating back 60 years or more. Mr. Mandelbrot's extensive experience and MLF's document library have proven invaluable in assisting thousands of claimants with the difficulties of documenting their asbestos exposures at various work locations decades ago. Documenting the specific exposure sites and exposure history is a necessary element of submitting a claim to the trusts. *Id.* at ¶9.

The Plaintiffs have submitted over 13,000 claims on behalf of asbestos claimants to more than 30 asbestos settlement trusts nationwide. Moreover, the Plaintiffs have submitted in excess of 2,200 claims to the Delaware Trusts on behalf of claimants meeting the specified criteria establishing disease and damages caused by exposure to asbestos since Mr. Mandelbrot and MLF first began filing claims with the Delaware Trusts in approximately June, 2005. *Id.* at ¶8.

Until recently, the Plaintiffs had never encountered any controversy regarding the reliability or truthfulness of evidence submitted to any settlement trusts, and during the period from June, 2005 through September, 2012, the Delaware Trusts had never raised any issues regarding the general reliability or truthfulness of the documentation and other evidence submitted by the Plaintiffs. However, on October 4, 2012, the Delaware Trusts informed the Plaintiffs that they had unilaterally decided to (i) suspend all offers and payments to claimants represented by the Plaintiffs and (ii) cease accepting further claim submissions from the

6

Plaintiffs effective as of September 28, 2012, pending further review of claims filed by the Plaintiffs. *Id.* at ¶10 and Exhibit G.

The Delaware Trusts took these actions because three asbestos trusts based in California (the "California Trusts") commenced adversary proceedings (the "California Adversary Proceedings") in September, 2012 seeking to conduct unwarranted and excessive investigations into claims filed by the Plaintiffs. These investigations were initiated largely due to unsolicited, unfounded and spurious allegations made by John Lynch, a former employee of the Plaintiffs. *Id.* at ¶11.

Mr. Lynch was employed by MLF from December 1, 2010 through June, 2012. As set forth more fully in the Mandelbrot Affidavit, Mr. Lynch's employment with MLF terminated abruptly in June of 2012 when MLF discovered that he had stolen and forged a check for approximately $26,000. Within two weeks, Mr. Lynch retaliated by contacting the California Trusts, claiming to have information about MLF's business practices. The California Trusts eventually took Mr. Lynch's deposition on September 14, 2012. *Id.* at ¶12.

Before taking his deposition, the California Trusts were already familiar with Mr. Lynch, as he was employed by the California Trusts prior to his employment with MLF. Before Mr. Lynch left their employ, the California Trusts became aware that he (1) had misused another employee's credit card and (2) had borrowed $20,000 from a different employee and failed to pay it back. Mr. Mandelbrot did not find out about these actions until after Mr. Lynch left his employment with MLF. *Id.* at ¶13.

Following his deposition, the California Trusts were, at minimum, aware of the following additional facts:

- Mr. Lynch had been charged with burglary, forgery and embezzlement by the Marin County District Attorney

- Mr. Lynch had falsified documents in connection with a family law matter
- Mr. Lynch had been the subject of wage garnishment proceedings due to passing bad checks other than the check stolen from MLF
- One week prior to being confronted about his embezzlement from MLF, Mr. Lynch sent Mr. Mandelbrot a personal note thanking Mr. Mandelbrot for hiring him and stating his strong belief in the future direction of MFL.

*Id.* at ¶14.

Mr. Lynch presented unsubstantiated and false testimony at his deposition. Nevertheless, despite his severe credibility problems, the California Trusts filed the California Adversary Proceedings shortly after Mr. Lynch's deposition. However, after filing these proceedings, the California Trusts sought and obtained an order allowing them to continue processing and paying claims submitted by MLF while the adversaries were pending. *Id.* at ¶15.

The Delaware Trusts did not conduct any type of review of any claims submitted by the Plaintiffs to the Delaware Trusts prior to or in connection with their decision to suspend the processing and payment of claims submitted by the Plaintiffs. Rather, the Delaware Trusts relied solely on the unsubstantiated allegations in the California Adversary Proceedings. *Id.* at ¶16.

The punitive actions taken by the Delaware Trusts against the Plaintiffs on October 4, 2012 were in direct contravention of the express terms of the Distribution Procedures. Specifically, pursuant to the terms of the Distribution Procedures, the Delaware Trusts are authorized to take punitive actions **only** after first determining, following an audit, that the penalized party had submitted **fraudulent information** supporting a claim. *See id.* at ¶17. The Trusts, in fact, acknowledged when they instituted their punitive actions against the Plaintiffs that such actions were taken as a result of disputed allegations, not fraudulent information. *Id.* at ¶17.

Following the suspension of all claims submitted by MLF, Mr. Mandelbrot received a letter on October 24, 2012 from the Delaware Trusts, requesting that the Delaware Trusts be

8

permitted to conduct a joint audit of claims submitted by MLF.[3]   That letter states "**while the Trusts have not to date discovered any irregularities in the processing of your claims**, due to the allegations made in the complaints against you and your law firm by other asbestos settlement trusts regarding claims filing practices, prudence requires that the Trusts obtain further information regarding a sample   of claims." **(emphasis added)**.   Mr. Mandelbrot immediately responded with his consent to this request.  On October 25, 2012, Mr. Mandelbrot received the list of 50 claimants whose claims were designated for review.  Because many of these claimants had filed claims with more than one of the Delaware Trusts, the audit encompassed a review of nearly 140 claims.  *Id.* at ¶18.

Shortly thereafter, the Plaintiffs compiled all documents relating to the claims being audited and sent them on disk to the auditor from ARPC, the entity conducting the audit for the Delaware Trusts.  On November 5, 2012, Ms. Eskin confirmed that the auditor had received the documents.  *Id.* at ¶19.  On November 12, 2012, following an initial review of the claims selected for the audit, Ms. Eskin informed Mr. Mandelbrot that the Delaware Trusts would require additional information for certain claims.  Another auditor from ARPC contacted Mr. Mandelbrot by email on November 13, 2012 requesting additional information on certain of the claims reviewed.  *Id.* at ¶20 and Exhibit I.

On November 19, 2012, Michael Dunning, MLF's Director of Claims, sent a detailed written response to the auditor's request for information, together with a DVD containing additional documents to assist the auditor in his review.[4]  However, in preparing the response to the auditor's request for additional information, Mr. Dunning discovered a document prepared by

---

[3] *See* Mandelbrot Exhibit, Exhibit H.

[4] *See* Mandelbrot Affidavit, Exhibit J.

Mr. Lynch in support of a claim subject to the audit that appeared to be irregular because it appeared that Mr. Lynch had copied a notary stamp and signature from one affidavit from a claimant onto a supplemental affidavit from the same claimant. This was not an issue raised by the Delaware Trusts with respect to this claim or any other claim submitted by the Plaintiffs to the Delaware Trusts. *Id.* at ¶21.

Mr. Mandelbrot immediately ordered his staff to examine every affidavit and signed document prepared by Mr. Lynch that was submitted to the Delaware Trusts. This examination led to the discovery of thirty-two files where Mr. Lynch had prepared irregular documents in support of claims filed with the Delaware Trusts, primarily consisting of notarizations photocopied from one affidavit onto a second. The Plaintiffs believe that, despite the photocopied notarizations, the information submitted was generally accurate and reliable. It defies explanation as to why Mr. Lynch photocopied the notarizations instead of having the affidavits properly notarized. Mr. Lynch did not disclose that he had photocopied the notarizations on certain claimants' asbestos exposure affidavits when he was deposed by the California Trusts on September 14, 2012. *Id.* at ¶22.

Based on its own investigation, MLF prepared a detailed report of all cases involving Mr. Lynch's photocopied notarizations and the remedial steps taken by MLF to ensure that no other claims were affected, and delivered that report and supporting documentation to the Delaware Trusts. This information was first reported to the Delaware Trusts on November 16, 2012. The Plaintiffs also withdrew all claims prepared by Mr. Lynch that were submitted to all of the Delaware Trusts as well as a dozen other trusts nationwide. *Id.* at ¶23.

Immediately following the Plaintiffs' voluntary and full disclosure regarding the photocopied notarizations supporting certain claims prepared by Mr. Lynch, the Delaware Trusts

stopped their initial audit.   On November 20, 2012, the Delaware Trusts informed Mr. Mandelbrot that they would, instead, require a full audit of all claims submitted by the Plaintiffs to the Delaware Trusts before they would allow the processing or payments of any further claims submitted by the Plaintiffs.  In addition, the Delaware Trusts demanded that the Plaintiffs agree in advance to pay substantial costs they allege will be incurred in conducting such audits.  *Id.* at ¶24.

The Plaintiffs agreed and continue to agree to cooperate fully with any reasonable audit conducted by the Delaware Trusts.   The Plaintiffs, however, did not and will not agree in advance to pay the claimed cost of such audit because there is no basis in the Trusts' governing documents for such a requirement.  The Trusts' actions would wrongfully impose sanctions on MLF before the results of any audit are known.  It would also prevent any further review of these sanctions.  *Id.* at ¶25.

### C.      Impact of the Delaware Trusts' Actions

The Delaware Trusts' unwarranted and unauthorized refusal to (i) process claims already submitted by the Plaintiffs and (ii) accept additional claims from the Plaintiffs is causing serious harm to claimants, who are beneficiaries of the Delaware Trusts.  Mr. Mandelbrot estimates that the Plaintiffs have filed approximately 1,000 claims that the Delaware Trusts have suspended or are refusing to process.  Mr. Mandelbrot does not know where these claims are in the FIFO claim processing queue or how long it will take the Delaware Trusts to complete the processing of these claims once they decide, or are ordered to, begin processing these claims.  *Id.* at ¶27.

The Plaintiffs also represent many claimants who have not been able to file their claims due to the Delaware Trusts' refusal to accept and process any claims submitted by the Plaintiffs. Mr. Mandelbrot estimates that these beneficiaries of the Delaware Trusts collectively have

between 2,000 and 2,500 claims that the Delaware Trusts are refusing to accept. This includes approximately 400 previously-filed claims withdrawn because they had been prepared by Mr. Lynch, and which MLF intended to review and promptly re-file, but have been unable to do so due to the Delaware Trusts' actions. *Id.* at ¶28.

The unwarranted delay in the processing and payment of these claims is causing serious and substantial harm, including delays in compensation (for medical bills and other needs) to many of these claimants, some of whom have mesothelioma, which is usually fatal. These claimants have already been victimized by the harmful effects of asbestos and the tortfeasors' bankruptcy filings due to their inability to reimburse victims in full for the damages caused by their products. *Id.* at ¶29.

Now the Delaware Trusts are victimizing these claimants again by their arbitrary and unauthorized actions. The removal of these claims from the FIFO claims processing queue will undoubtedly cause a substantial delay in the resolution and payment of these claims. And given that the Delaware Trusts have historically reduced the claims payment percentage as time goes by, these claimants face the real possibility that the delay will result in a reduction of the actual amount that they will receive on account of their claims. Moreover, the unwarranted delay in the processing of these claims creates the risk that necessary evidence supporting the claims may disappear as time passes. *Id.* at ¶30.

Furthermore, the claimants who have been prevented from filing their claims face imminent irreparable harm because the Distribution Procedures require that claims be filed within three years after diagnosis of an asbestos-related disease. Many of these claimants are quickly approaching this deadline. *Id.* at ¶31

Finally, the suspension of the Plaintiffs' ability to file claims and the delay in processing the claims already filed, which has now lasted for over eight months, poses the risk of immediate and irreparable harm to the Plaintiffs.  The Plaintiffs are unable to accept new clients while the suspension remains in place, and many existing clients have requested that their claims be transferred back to the referring law firm or to a different firm.  If not remedied promptly, the ongoing suspension and the Delaware Trusts' demand that the Plaintiffs consent in advance to pay for any audit the Delaware Trusts chose to conduct, which the Delaware Trusts estimate could be as much as $150,000, will likely force MLF to close.[5]  *Id.* at ¶33.

## ARGUMENT

### I.  Standards for Granting Preliminary Injunctive Relief

Rule 65 of the Federal Rule of Civil Procedures permits a court to issue a preliminary injunction upon notice to the adverse party.  Fed. R. Civ. P. 65(a).  The decision whether to grant a motion for a preliminary injunction is within the sound discretion of the Court.  *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982).

"'A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Keurig, Inc. v. Strum Foods, Inc.*, 769 F.Supp.2d 699, 705 (D. Del. 2011).  In deciding a motion for injunctive relief, the Court must weigh the appropriate factors rather than applying

---

[5] Making matters worse, the Delaware Trusts are unreasonably insisting on a full audit, including medical evidence submitted by the Plaintiffs, even though there has not been a hint of an allegation that any claims Plaintiffs have submitted are based on unreliable medical evidence. This will increase the estimated cost of the audit substantially.

them mechanically. *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 197 Fed. Appx. 120, 124 (3d Cir. 2006). The court must engage in a "delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *Id.* A strong showing on one factor may affect the necessary showing with regard to another. *Crouch v. Prior*, 905 F. Supp. 248, 255 (D.V.I. 1995).

## II. **The Court Should Grant Preliminary Injunctive Relief in Favor of the Plaintiffs**

The Plaintiffs can establish that each of the preliminary injunction standards weighs in their favor. Accordingly, the Court, in its sound discretion, should grant the relief requested by the Plaintiffs based on the facts and circumstances of this case.

### A. **Likelihood of Success on the Merits**

In order to establish that it is likely to succeed on the merits, a movant need only establish a *prima facie* case supporting its right to the relief requested. Certainty of success is not required. *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).

Here, the Plaintiffs are likely to succeed on the merits because the punitive actions taken by the Delaware Trusts on October 4, 2012 and November 20, 2012 were not authorized by the documents governing the Delaware Trusts. The Distribution Procedures for each of the Delaware Trusts, which expressly address the issues raised in this case, generally authorize the Delaware Trusts to develop methods for auditing the reliability of evidence submitted by claimants. However, the Distribution Procedures authorize punitive actions against claimants or claimants' attorneys, such as those taken by the Delaware Trusts here, **only** if an audit first reveals that such claimant or attorney submitted **fraudulent** information in support of a claim.

The punitive actions taken by the Delaware Trusts were neither warranted nor authorized by the Distribution Procedures. The actions taken by the Delaware Trusts on October 4, 2012

were admittedly unauthorized because, as acknowledged in her October 24, 2012 letter, **"the Trusts have not to date discovered any irregularities in the processing of your claims . . . ."**

Similarly, the Delaware Trusts' November 20, 2012 decision to further suspend the processing and payment of claims submitted by the Plaintiffs pending a full audit of all claims submitted by the Plaintiffs and requiring the Plaintiffs to agree in advance to pay for the full cost of the audit, regardless of its result, was not authorized by the Distribution Procedures. Assuming that the photocopied notarizations on claimant exposure affidavits prepared by Mr. Lynch would be considered fraudulent information, which is arguable given that the information contained in the documents was generally accurate and reliable, the documents in question were not discovered as a part of any audit. Rather, the Plaintiffs (i) discovered these documents, (ii) voluntarily reported the documents to the Delaware Trusts, (iii) promptly provided the Delaware Trusts with detailed information regarding these documents, and (iv) promptly withdrew all of the claims submitted to the Delaware Trusts that were prepared by Mr. Lynch, the majority of which did not include photocopied notarizations. The Plaintiffs took prompt and immediate action to remedy the problem and ensure that no claims were paid that might be seen as tainted by Mr. Lynch's unauthorized actions.

Regardless, the Delaware Trusts do not have the authority to impose sanctions on a law firm such as those imposed here. The Celotex Trust Claims Distribution Procedures permit the Trustees to seek sanctions from the District Court, but provide no authority to impose any such requirements unilaterally. *See* Mandelbrot Affidavit, Exhibit F at Section 7.4. The Trust Distribution Procedures of the remaining trusts allow certain audit-related penalties to be imposed by the trusts but require that sanctions be sought through the Bankruptcy Court. None of the Trusts' Distribution Procedures provide that the trusts can suspend a law firm's filing

privileges unless that firm agrees in advance to pay the proposed penalty—in this case, the full cost of an audit—effectively insulating that sanction from any further review. This is a gross violation of due process and inconsistent with the plain language of Section 5.8 of the Trust Distribution Procedures authorizing the Trusts to require sanctions from the Bankruptcy Court.

Finally, given the remedial actions taken by the Plaintiffs upon discovery of the photocopied notarizations, the Delaware Trusts' November 20, 2012 actions were both unauthorized by the Delaware Trusts' governing documents and unjustified as a matter of common sense. Accordingly, the Plaintiffs can establish that they are likely to succeed on the merits in this action.

### B. Irreparable Harm

A party can establish irreparable harm by demonstrating that the potential harm cannot be redressed by a legal or equitable remedy following trial. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The Plaintiffs can establish that they and their clients will suffer irreparable harm if the preliminary injunction is not granted for three independent reasons.

First, all claimants represented by the Plaintiffs face the possibility of irreparable harm due to the Delaware Trusts refusal to process their claims. *See In re Diet Drugs Prod. Liability*, 236 F.Supp.2d 445 (E.D. Pa. 2002). In *Diet Drugs*, a class action settlement trustee challenged fen-phen products liability claims submitted to the trust by two law firms. *See id.* at 448. An audit revealed that the two law firms had relied on the evaluations of cardiologists whose methods were flawed, resulting in the submission of "medically unreasonable" claims. *Id.* Specifically, the trustee sought to (i) expand the scope of the trust's auditing powers and (ii) bar the law firms from submitting any further claims that had been evaluated using the methods

16

challenged by the trustee. *Id.* On the basis of expert testimony, the court found that the claims at issue were medically unreasonable. *Id.* at 460. Because the settlement trust agreement only authorized the trustee to audit 15% of the claims submitted to the trust – thus effectively ensuring that 85% of all claims would be paid regardless of the medical reasonableness – the court acquiesced in the trustee's request for expanded discretion to audit claims beyond the original 15%. *See id.* at 462. However, the court refused to bar the law firms from representing clients in filing further claims since this would "cause needless harm to innocent claimants who are eligible for benefits" and the audit process was already a sufficient remedy for the prevention of fraud. *Id.*

Here, just as the *Diet Drugs* Court recognized, the Delaware Trusts' unauthorized actions are causing needless harm to the beneficiaries of the Delaware Trusts represent by the Plaintiffs. The removal of these claims from the FIFO claims processing queue will undoubtedly cause a substantial delay in the resolution and payment of these claims. And given that the Delaware Trusts have historically reduced the claims payment percentage as time goes by, these claimants face the real possibility that the delay will result in a reduction of the actual amount that they will receive on account of their claims. Moreover, the unwarranted delay in the processing of these claims creates the risk that necessary evidence supporting the claims may disappear as time passes.

Second, the claimants who have been prevented from filing their claims face imminent irreparable harm because the Distribution Procedures provide that claims must be filed within three years after the diagnosis of an asbestos-related disease. Many of these claimants are quickly approaching this deadline, and the continued refusal of the Delaware Trusts to allow the Plaintiffs to submit claims on behalf of these claimants could result in these claims being time

barred. *See, e.g., In re Olympia Holding Corp.*, 141 B.R. 443, 446-47 (Bankr. M.D. Fla. 1992) (holding that Interstate Commerce Commission's cease and desist order threatened irreparable harm because it "would prohibit the commencement of actions to collect or effectively would prohibit, by delaying, the commencement of actions to collect these accounts receivable.").

Third, the suspension of the Plaintiffs' ability to file claims and the delay in processing the claims already filed, which has now lasted for over eight months, poses the risk of immediate and irreparable harm to the Plaintiffs. The Plaintiffs are unable to accept new clients while the suspension remains in place, and many existing clients have requested that their claims be transferred back to the referring law firm or to a different firm. The ongoing suspension and the Delaware Trusts' demand that the Plaintiffs consent in advance to pay for the proposed audit, estimated to cost up to $150,000, if not remedied promptly, will likely force MLF to close. *See, e.g., Doran v. Salem Inn, Inc.*, 95 S. Ct. 2561, 2568 (1975) (holding that unrebutted allegations from movants demonstrating "that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy" constituted irreparable harm sufficient to support the entry of a preliminary injunction); *Newlife Homecare Inc. v. Express Scripts, Inc.*, 2007 WL 1314861, *4 (M.D. Pa. 2007) (holding that evidence establishing the probability of a substantial loss of business constitutes irreparable harm).

### C. **Balancing of Harms**

In contrast to the significant harm currently being inflicted upon the Plaintiffs and their clients, there will be no harm to the Delaware Trusts if the Court grants the relief requested. The Delaware Trusts already have the ability to review each and every claim submitted by the Plaintiffs and all evidence in support of such claims and can request additional evidence if they determine that any claim does not meet the standards set forth in the Distribution Procedures.

Moreover, unlike the trustee in *Diet Drugs*, the Delaware Trusts have the authority to audit as many claims as necessary to ensure that unreliable claims are not paid. Accordingly, this factor weighs strongly in favor of granting the relief requested.

### D. Public Interest

The Delaware Trusts were formed in the wake of bankruptcies filed by debtors that could not survive under the weight of potential liability for asbestos related diseases caused by products that they manufactured. In recognition of the fact that asbestos claimants would not receive payment in full on account of their claims because of the bankruptcies, the Delaware Trusts were formed for the purpose of providing fair, equitable and substantially similar treatment for all claimants with claims that may presently exist or may arise in the future. The Distribution Procedures were designed with the goal of effectuating this purpose.

The Delaware Trusts' unauthorized actions are thwarting the purpose of the Delaware Trusts for the beneficiaries of the trusts represented by the Plaintiffs. These claimants are not being treated fairly, equitably, or substantially similar to other claimants. The Delaware Trusts' have the ability to remedy this by continuing to process and pay claims submitted by the Plaintiffs while conducting an audit and, through the review process, ensure that unreliable claims are not paid. Requiring the Delaware Trusts to take these actions will further the purpose of the Delaware Trusts.

## CONCLUSION

WHEREFORE, for the foregoing reasons the Plaintiffs respectfully request that this Honorable Court enter a preliminary injunction, substantially in the form attached to the Motion, (i) enjoining the Defendants from (x) refusing to accept and/or process claims submitted by the Plaintiffs pending a full audit of claims submitted to the Defendants by the Plaintiffs and (y) requiring the Plaintiffs to agree in advance to pay substantial costs the Defendants allege will be incurred in conducting such audit, (ii) requiring the Defendants to accept and process claims submitted by the Plaintiffs to the Defendants and (iii) granting to the Plaintiffs such other and further relief as the Court deems just and proper.

Dates:  June 21, 2013                    SULLIVAN · HAZELTINE · ALLINSON LLC

                                         _____
                                         William D. Sullivan (No. 2820)
                                         William A. Hazeltine (No. 3294)
                                         Seth S. Brostoff (No. 5312)
                                         901 North Market Street, Suite 1300
                                         Wilmington, DE 19801
                                         Tel: (302) 428-8191
                                         Fax: (302) 428-8195

                                         *Attorneys for Plaintiffs Michael J. Mandelbrot and the Mandelbrot Law Firm*

20

## <u>CERTIFICATE OF SERVICE</u>

I, William A. Hazeltine, hereby certify that on June 21, 2013, I caused one copy of the

foregoing to be served upon the parties listed below in the manner indicated.

**Via Hand Delivery**
Bernard G. Conway, Esq.
Campbell & Levine Delaware
222 Delaware Avenue, Suite 1620
Wilmington, DE 19801

*Counsel to the Babcock & Wilcox*
*Asbestos Personal Injury Settlement*
*Trust, Owens Corning/Fibreboard*
*Asbestos Personal Injury Trust, Federal-*
*Mogul Asbestos Personal Injury Trust,*
*and United States Gypsum Asbestos*
*Personal Injury Settlement Trust*

**Via Electronic Mail and First Class U.S. Mail**
Jennifer J. Morales, Esq.
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Email:  JMorales@KMKLAW.com

*Counsel to the Armstrong World Industries*
*Asbestos Personal Injury Settlement Trust  and*
*Celotex Asbestos Settlement Trust*

*June 21, 2013*
Date

*/s/ William A. Hazeltine*
William A. Hazeltine